Marshel **KEITH**, Respondent–Appellant,

v.

**BURLINGTON NORTHERN RAILROAD COMPANY**, Appellant–Respondent.

Nos. 18959, 18967.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 17, 1994.

Motion for Rehearing or Transfer
Denied Dec. 9, 1994.

Application to Transfer Denied
Jan. 24, 1995.

Thomas Strong, Jeffrey W. Bates, Clifton Smart III, Strong & Associates, P.C., Springfield, for respondent-appellant.

Glenn A. Burkart, Bruce E. Hunt, Daniel E. Miller, Mann, Walter, Burkart, Weathers & Walter, L.C., Springfield, for appellant-respondent.

MONTGOMERY, Judge.

Marshel Keith (Plaintiff) obtained a jury verdict of $900,000 on his claim against the Defendant Burlington Northern Railroad Company (BN) under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, et seq. (1986) (FELA). The trial court entered judgment for Plaintiff in accordance with the jury verdict. BN's post-trial motions included a motion to amend the judgment in which BN requested a credit against the judgment for all Railroad Retirement Board (RRB) sickness benefits and for all "Benefit Trust Life" benefits paid to Plaintiff. The trial court sustained this motion and entered an amended judgment in the amount of $875,-771.67. BN's remaining motions were overruled. The parties filed cross-appeals.

Plaintiff's sole point on appeal complains that BN was not entitled to any credits on the judgment. BN's appeal presents twenty allegations of trial court error.

Plaintiff submitted his case based upon BN's negligent failure to provide either reasonably adequate help or reasonably safe methods of work. The facts which support these theories of negligence follow.

Plaintiff worked for BN on Gang 826. On May 8, 1991, Gang 826 had the job of removing old railroad ties from Bridge 62.9. On this date the five-man gang was one man short because one person was on vacation. Larry West, foreman of the crew, asked his superior for additional help but none was supplied. In any event, West was responsi-

ble for deciding the method of work to be used and for ensuring the safety of his crew.

A truck crane stationed on the tracks adjacent to the bridge aided removal of the ties from the bridge. West and another crew member worked on the bridge removing the ties. They attached each tie to the crane's cable using tongs which were connected to the center area of each tie. Hal Choate, the crane operator, then lifted and carried the ties over to the area where Plaintiff stacked them. Each tie weighed between 450–600 pounds. Plaintiff, working alone, had the job of guiding the placement of each tie on the stack and after the tie came to rest, unhooking the tongs from it. That process was repeated until one stack was completed shortly before noon. The crew stopped for lunch before starting a second stack.

The ties were being stacked on four or five "three by twelve" boards (walkway boards which had been removed from the bridge). These boards had been placed on the right-of-way parallel to the rail line, and the ties were being stacked perpendicularly across the boards. The first stack consisted of fifteen ties, stacked five to a row and three rows high. Plaintiff intended to build a second stack in the same manner because a total of thirty ties had to be removed from the bridge.

The site that West selected for stacking the ties sloped downhill to the east and to the north (a compound slope with a grade of 17%). Therefore, the ground underneath the boards was somewhat uneven.

That afternoon Plaintiff was in the process of placing approximately the ninth tie on the second stack. He guided the tie into position, and Choate let the weight of the tie come to rest on the stack which allowed the cable to slacken. While Plaintiff was unhooking the cable, two ties from the first stack fell and fractured his left leg. At that time, Plaintiff was located midway between the two stacks with his back to the first stack. The two stacks were approximately three and a half to four feet apart. Plaintiff had to be between the stacks in order to unhook the cable since it was attached to the middle of each tie.

Plaintiff introduced evidence that the safe practice required two men to stack the ties. When two men stack the ties, they are positioned at each end of the tie to guide it in place. Only after the tie comes to rest would one man then walk to the middle and unhook the cable. The stacking is dangerous when the weight of the tie comes to rest on the stack. At that point, the added weight could cause the stack to shift and possibly fall on a nearby worker. When two men stack ties, neither of them would be in the middle of the stack until after the critical time had passed.

Plaintiff's expert witness explained why ties from the first stack fell on Plaintiff. He testified the boards were not flush against the ground due to the compound slope and 17% grade. Because the boards were on uneven ground they would sag or bend to the ground as more weight was added. The expert concluded that when the extra weight of the ninth tie was added to the second stack, there was either a sag in the underneath boards or there was a "teeter-totter" effect which caused the ties to fall.

### BN'S APPEAL NO. *18959*

BN's first point complains of improper closing argument from Plaintiff's counsel. BN alleges the trial court erroneously denied its request for a mistrial and its alternative request that the jury be instructed to disregard Plaintiff's argument concerning "foreseeability" because the argument was misleading and misstated the law.

In evaluating BN's assertion, we are mindful that "[d]etermining the prejudicial effect of final argument is a matter within the discretion of the trial court, and the trial court's judgment on that matter will not be disturbed unless there was an abuse of discretion." *Hoover's Dairy v. Mid–America Dairymen*, 700 S.W.2d 426, 434 (Mo. banc 1985). Wide discretion is given to a trial judge and, absent abuse, the judge's decision will stand. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 870 (Mo. banc 1993). Furthermore, "the law indulges a liberal attitude toward argument, particularly where the comment complained of is fair retort or responds to prior argument of

opposing counsel." *Lewis v. Bucyrus–Erie, Inc.,* 622 S.W.2d 920, 926 (Mo. banc 1981).

■ Plaintiff justifies his remarks by taking the position that his rebuttal argument was a proper retaliatory response to BN's earlier misstatement of the law on foreseeability. Plaintiff correctly urges that we must review his challenged comments on foreseeability in light of the entire record and not in isolation. *See Lewis,* 622 S.W.2d at 926.

■ Understanding the parties' arguments first requires a brief discussion of the type of foreseeability necessary for establishing liability in a FELA case. Both parties cite *Gallick v. Baltimore & O.R.R.,* 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963), for the rule that reasonable foreseeability of harm is an essential ingredient in a FELA negligence case. *Id.* at 117, 83 S.Ct. at 665. Thus, "[i]n this context, FELA negligence exists if the employer knew or should have known its standard of conduct was inadequate to protect its employee from injury." *Hertzler v. Burlington N. R.R.,* 720 S.W.2d 762, 766 (Mo.App.1986). Furthermore, "[i]t is knowledge or anticipation of the possibility of harm to plaintiff, not of the exact nature of the injury, that is determinative." *Stewart v. Alton & S. Ry.,* 849 S.W.2d 119, 125 (Mo. App.1993).

■ These cases demonstrate that the foreseeability requirement is satisfied if some injury, rather than plaintiff's precise injury, were reasonably foreseeable. Therefore, as both parties agree, there are two kinds of foreseeability—general and specific. The failure to prove general foreseeability is fatal to recovery in a FELA case, while the failure to prove specific foreseeability is not.

This view is consistent with the requirement of MAI 24.01 (1992 Revision) (the applicable FELA verdict director) when the element of foreseeability is disputed. In that instance the Notes on Use, Note 2, specifies that the following paragraph shall be submitted, "Second, conditions for work were not reasonably safe and defendant knew or by using ordinary care could have known of such conditions and that they were not reasonably safe, and."

Before delving into the closing arguments, one significant circumstance must be noted. At the instruction conference, Plaintiff first tendered a verdict director patterned after MAI 24.01. This instruction contained the foreseeability element for submission to the jury as required by the Notes on Use under MAI 24.01. Although BN's counsel made only a general objection to this instruction, the trial court refused the instruction and marked it as "Court A." Plaintiff tendered another verdict director, marked as Instruction 7, which was submitted to the jury over BN's specific objections. The two instructions were identical in nature except that Instruction 7 omitted the foreseeability element. None of BN's objections went to that omission.

The argument about which BN complains follows:

We get a verdict, you see, we get a verdict if you believe adequate help, methods of work, third, such negligence resulted in whole or in part in injury to Plaintiff Marshel Keith. This means even if you believe Marshel Keith was somewhat negligent, we still get a verdict, even if you believe that this was unforeseeable, we still get a verdict. You know, I heard said once that if a lawyer can say something three times, it is just as good as if it were the law. And from the opening statement to the final argument, Mr. Hunt has talked about this wasn't foreseeable. He couldn't foresee it, West, Gillen, Choate, no one foresaw it. Folks, you can read these instructions until you go blind and you will find no requirement that Keith, or West, or anyone had to foresee this coming. There is no element in the case that says that. This is the verdict directing instruction, and you can't see the word foreseeable anywhere there. Mr. Hunt has gone through most of the instructions. Folks, you talk about smoke screen. My prayer is that you will follow the law of this case. Because a lawyer talks about foreseeability a dozen times over 10 days, doesn't make the law something that it isn't. There is no requirement of foreseeability, none, zero, zip. You have to be careful to avoid the unforeseeable. That's why we have fuses in

houses, so if a squirrel does gnaw through a wire and causes a fire you have safety to avoid the accident, the unforeseeable. And it's unforeseeable that some drunk is going to run a red light, but you have a seat belt in your car if you want to use it, to help avoid the unforeseeable. You see, the law requires safety, and the law requires either reasonably adequate help or reasonably safe methods of work.

▬ According to BN, Plaintiff plainly crossed the line of improper argument when he said, "There is no requirement of foreseeability, none, zero, zip." Without considering the other factors present, BN would be correct. As in all actions based on negligence, including a FELA claim, foreseeability is a necessary element. *See Gladden v. Missouri Pub. Serv. Co.*, 277 S.W.2d 510, 519 (Mo. 1955). Therefore, standing alone, Plaintiff's argument that there is no requirement of foreseeability is a misstatement of the law. "Misstatements of the law are impermissible in final argument and should be promptly corrected by the court." *White v. Gallion*, 532 S.W.2d 769, 771 (Mo.App.1975).

However, Plaintiff urges that his remarks were a proper retaliatory response to BN's earlier misstatements of the law that "specific foreseeability" was a defense. Plaintiff points to the following specific foreseeability statements made by BN during closing argument:

[T]he appearance of the way the ties were stacked in this first stack was such that there was *nothing about them that led Mr. Keith to believe **one of them might fall off.*** ... And *I told you in opening statement that that would be important because it goes to foreseeability.*

\* \* \* \* \* \*

I believe that when you deliberate, you're going to find ... that *just as Plaintiff has agreed, **this** was not a foreseeable event.*[1]

\* \* \* \* \* \*

I don't dispute that a railroad tie rolled off the stack behind it and that he *[Marshel Keith] was so comfortable and thought*

that it was so safe the way he had built it, and that it was so unforeseeable to him that *this stack* was going to roll, that a part of it would roll off was so unforeseeable to him that there was any potential of danger, that he had his back to it.

\* \* \* \* \* \*

Now, let's talk about once again the foreseeability of *this situation* and why this is so important. Mr. *West has said that it was not foreseeable to him,* having safely used this practice for some 27 years, *that there was going to be an accident out there, that there was going to be **this situation** that arose.* The Plaintiff has said the same thing.

\* \* \* \* \* \*

*[This] situation* as it existed out there on May the 8th, 1991, was a situation that appeared to everyone, to everyone, to be safe. There's *not a single person* that came forward *that was out there that day* that *said it was foreseeable to us there was any danger involved.* Not a one.

\* \* \* \* \* \*

For the Plaintiff *Marshel Keith to win,* for you to find in favor of Mr. Keith, *his attorneys must persuade you of something even Marshel Keith does not believe, and that is that **this accident** was foreseeable.* I'm going to say it again, for Mr. Keith to prevail, his attorneys have got to be so persuasive based upon the evidence that *Marshel Keith said it was not foreseeable to him that the stack would fall off, **this one tie would roll off,*** it was not foreseeable that the stack had been built wrong, or that *this accident* was going to happen, because, you see, for you to find negligence you've got to find foreseeability. (Plaintiff's emphasis.)

From these arguments, we conclude that the trial court had a basis to determine that BN was arguing "specific foreseeability," i.e., since no one could have foreseen the occurrence of the exact event which injured Plaintiff, BN was not liable for his injuries. Like-

---

1. In response to his attorney's direct examination, Plaintiff stated he did not foresee that his injury was likely to occur.

wise, the trial court could have construed Plaintiff's rebuttal argument as properly responding to BN's improper specific foreseeability remarks.[2] We reach these conclusions because of the broad discretion possessed by the trial court in the control of final argument. *See Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990).

Our decision is further bolstered after considering that the verdict director (Instruction 7) failed to submit the foreseeability element. Clearly, Plaintiff believed foreseeability was an issue for the jury because he tendered an instruction containing that element. When Plaintiff argued that a finding on foreseeability was not required by the instructions, he was correct. However, the blame for omitting the foreseeability element from the verdict director must be laid at the feet of BN. In other words, absent BN's objection, the issue of foreseeability would have squarely been before the jury and such submission would have precluded much of Plaintiff's argument.

This case is unlike *White v. Gallion, supra*, cited by BN. There, counsel's improper argument "conflicted with the court's written instruction and substantially prejudiced the rights of plaintiff." 532 S.W.2d at 771. Here, there was no conflict between Instruction 7 and Plaintiff's argument.

Although resolving this issue is difficult, our job is made easier because Instruction 7 failed to submit the issue of foreseeability to the jury. Therefore, we deny Point I because the law indulges a liberal attitude towards closing argument and the trial court has broad discretion in the control thereof.

■■■ BN's Point II alleges the trial court erroneously denied its request for a mistrial and its alternative request for the jury to be instructed to disregard Plaintiff's improper argument which created an adverse inference regarding BN's failure to call Ron Michelbook as a witness. BN urges that Plaintiff was not entitled to make such adverse comment because Plaintiff had read portions of

Michelbook's deposition testimony into evidence as admissions against BN.

Plaintiff's alleged improper argument consists of the following remarks:

And do you remember Mr. Hunt's questioning of Mr. Michelbook about this question, when [Dr. Mohsen] was on the stand he said, well, you don't know what was in Mr. Michelbook's mind when he said we do not have work for an employee, you don't know what he meant, do you? Do you remember the questions? [Dr. Mohsen] said, well, I know what he wrote, we don't have work. Now, what did you expect when those questions were asked? That Mr. Michelbook who has been in the courtroom every day except yesterday would take the stand and say, well, what we really meant was he could work part-time as a janitor, or, what we really meant was that he could greet people on a train? But Mr. Michelbook didn't take the stand yesterday. He wasn't even here so we could call him.

Plaintiff's argument was referring to a letter written by Michelbook which indicated BN had no available jobs for Plaintiff considering his physical limitations. Plaintiff's counsel had explored the contents of the letter during the testimony of Dr. Mohsen, one of Plaintiff's expert witnesses.

During opening statement BN's counsel told the jury that Michelbook had "been designated as the corporate representative for [BN]" and will testify later in the case. Likely, BN's counsel was referring to Michelbook's earlier designation as BN's corporate representative for depositions pursuant to Rule 57.03(b)(4).

Plaintiff's counsel deposed Michelbook twice and portions of his deposition testimony were received in evidence as admissions of BN. Michelbook had knowledge of certain facts related to the controversies concerning BN's liability and Plaintiff's damages. Michelbook was Larry West's superior who had denied his request for additional help on May

**2.** Implying that Plaintiff waived his right to retaliate, BN points out that Plaintiff failed to object during its closing argument. According to *Heisler v. Jetco Serv.*, 849 S.W.2d 91, 94 (Mo.App.

1993), Plaintiff could ignore the alleged improper argument and still retain the right to "set the record straight."

8, 1991. He also authored the letter on job availability mentioned above.

Because Plaintiff read favorable portions of Michelbook's deposition to the jury, BN urges that Plaintiff is not entitled to comment adversely on BN's failure to call him as a witness. BN relies on *Kelly by Kelly v. Jackson, supra,* where the court said that "a party may not have the advantage of an adverse inference while benefiting by reading favorable portions of the witness' deposition to the jury." 798 S.W.2d at 702.

This principle is sound but it relates to the deposition of a witness, not a party. Different rules apply when a party having knowledge of the facts fails to testify.

"The rule which permits an unfavorable inference to be drawn against a party, knowledgeable of the facts of the controversy, who fails to testify and which permits such failure so to be used by an opponent in argument to the jury is well established." *Pasternak v. Mashak,* 428 S.W.2d 565, 568 (Mo.1967), *cert. denied,* 390 U.S. 907, 88 S.Ct. 821, 19 L.Ed.2d 872 (1968). This court applied that rule in *Stringer v. Reed,* 544 S.W.2d 69, 74 (Mo.App.1976). In *Pasternak,* the will contestant introduced as an admission against interest portions of a deposition and interrogatory answers by the will proponent who did not testify at trial. The Supreme Court held that the will contestant should have been permitted to comment on the will proponent's failure to testify even though portions of his deposition and his interrogatory answers were introduced in evidence. The court also said that "[a]vailability is not a factor governing the right to comment when a party, as distinguished from a non-party witness, does not testify." 428 S.W.2d at 569.

Michelbook's status in this case is closely akin to that of a party. Because BN can only act through its agents and employees, Michelbook was designated its corporate representative to give deposition testimony which would be admissible against BN and binding on it. *State ex rel. Plank v. Koehr,* 831 S.W.2d 926, 929 (Mo. banc 1992). The deposition testimony of a witness is not admissible on that basis. Therefore, Michel-

book's status was not that of a witness so as to fall within the rule in *Kelly.*

Michelbook had personal knowledge of the facts pertaining to liability and Plaintiff's damages. After portions of his deposition, favorable to Plaintiff and binding on BN, were received in evidence, he did not testify. BN's counsel earlier said he would. Under these circumstances we find the trial court did not err in allowing Plaintiff's counsel to comment adversely on Michelbook's failure to testify without regard to his availability.

■ In Point III, BN asserts that the trial court plainly erred by not, *sua sponte,* instructing the jury to disregard the closing remark of Plaintiff's counsel that BN "largely stole [Plaintiff's] health on May the 18th." BN claims this remark was inflammatory and prejudicial because it accused BN of a crime. We disagree.

The remark was nothing more than Plaintiff's counsel saying BN was responsible for depriving Plaintiff of his health. No reasonable juror could have understood otherwise. Clearly, Plaintiff's counsel used the term "stolen" as a colloquialism and was not intended to be literally true.

■ Counsel has wide latitude to suggest inferences from the evidence on closing argument. *Moore v. Missouri Pac. R.R.,* 825 S.W.2d 839, 844 (Mo. banc 1992). Here, substantial evidence was introduced to show that plaintiff suffered a serious injury which adversely impacted his health.

The closing remark made here is similar to the one made in *Gathright v. Pendegraft,* 433 S.W.2d 299 (Mo.1968). There, plaintiff was injured as a result of a gas explosion in a home she occupied. During closing argument her counsel said:

"[Defendant homeowner] did have a hard time selling the house because people acted like someone had been murdered in it, and in practical effect I can understand the reaction of people because when you get right down to it as far as practicalities of the situation is concerned, someone was murdered in this house because the woman you see here, Rita Gathright, is not the

same Rita Gathright that went into the house on May 8, 1961."

*Id.* at 316.

On appeal, defendants relied on cases pertaining to argument accusing a party of gross misconduct without support of the evidence. In upholding the trial court, the Supreme Court said:

There was no accusation that Mrs. Gathright had been killed, and the jury was aware that she had not because she was sitting in the presence of the jury, and counsel for plaintiff referred to "the woman you see here." For this reason we do not agree with defendants' contention that the jury would consider that defendants were charged with a capital offense. We consider the argument that because of the injuries sustained in the explosion the person sitting in the courtroom was "not the Rita Gathright [who] went into the house on May 8, 1961," to have been justified by the record and to constitute permissible argument.

*Id.*

Like in *Gathright,* we consider Plaintiff's argument to have been justified by the record and to constitute permissible argument. Finding no error, plain or otherwise, Point III is denied.

■ Point IV alleges the trial court erroneously allowed Plaintiff to introduce evidence of safer, more expeditious, or alternative methods or devices to perform the tasks from which Plaintiff's injury arose. BN claims it has a duty only to provide reasonably safe appliances, devices, and methods of operation in exercising reasonable care.

Plaintiff was allowed to introduce extensive evidence concerning alternative and safer methods of stacking and storing railroad ties. His evidence indicated that several other methods and devices could have easily been utilized by BN other than the one actually employed.

■ We first observe that FELA cases tried in state courts are subject to state procedural rules, but the substantive law of the federal courts governs. *Eickelman v. Illinois Cent. Gulf R.R.,* 714 S.W.2d 611, 616 (Mo.App.1986). Admissibility of evidence is a procedural matter which in FELA actions are governed by the law of the forum. *Id.* Thus, admissibility of the questioned evidence is a matter of procedure which is governed by the law of this state.

In *Welsh v. Burlington N. R.R.,* 719 S.W.2d 793 (Mo.App.1986), the issue was whether the tools or methods of work which were in fact made available to plaintiff were reasonably safe. There, plaintiff's injury occurred while he was manually loading propane bottles on a railroad car. Evidence was admitted showing that BN had previously provided employees with carts to load propane tanks and could have provided plaintiff with a cart for that purpose. Relying on *Clark v. Widmer Eng'g Co.,* 263 S.W. 500, 501 (Mo.App.1924), the appellate court said:

We find that the testimony regarding the defendant's previous use of carts to load propane tanks on business cars, the requests made by employees to foremen to provide carts for the purpose of loading propane tanks and the testimony regarding the capability of defendant's own fabricating shop to construct the requested carts was relevant and probative on the issue of whether defendant was negligent in failing to provide reasonably safe equipment for its employees' use.

*Id.* at 797.

This result is consistent with the one in *Stone v. New York C., & St. L. R.R.,* 344 U.S. 407, 73 S.Ct. 358, 97 L.Ed. 441 (1953), a FELA case tried in Missouri state court. In that case, plaintiff was injured while in the process of removing railroad ties. At trial, evidence was admitted which indicated that other safer methods of removing the ties were available. The United States Supreme Court determined such evidence was properly admitted and said:

The experience with stubborn ties, the alternative ways of removing them, the warning by petitioner that he had been pulling as hard as he could, the command of his superior to pull harder, the fact that more than two men were usually used in these circumstances—all these facts comprise the situation to be appraised in determining whether respondent was negli-

gent. Those circumstances were for the trier of facts to appraise.

*Id.* at 409, 73 S.Ct. at 359.

*Ewing v. St. Louis S.W. Ry.*, 772 S.W.2d 774 (Mo.App.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 724, 107 L.Ed.2d 744 (1990), the only Missouri case BN relies upon, does not discuss the admissibility of evidence concerning alternative methods of work. There, plaintiff was injured when a wrench slipped while he was tightening a bolt on a truck transmission. He offered evidence of "things the defendant could and should have done to make the job safer." *Id.* at 776. The appellate court determined the trial court properly granted defendant's motion for judgment notwithstanding the verdict because plaintiff failed to establish that his injury resulted from defendant's negligence, even if defendant had implemented the safer method suggested by plaintiff. Thus, *Ewing* does not support BN's contention. Point denied.

■ Point V claims the trial court erred in refusing BN's tendered instruction marked "Court C" because it correctly stated the law and was necessary due to the evidence adduced by Plaintiff relating to safer methods and devices available for doing the work performed by Plaintiff.

Instruction C reads:

You are instructed that defendant was not required to furnish plaintiff with the latest, best, or most perfect appliances with which to work, nor to discard standard appliances already in use upon discovery of later improvements, provided those in use are reasonably safe and suitable. You may not find defendant liable merely because there may be a safer method of performing the work in question.

A contention like BN's was addressed in *Dunn v. St. Louis–San Francisco Ry.*, 621 S.W.2d 245 (Mo. banc 1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1007, 71 L.Ed.2d 298 (1982), where an instruction almost identical to BN's Instruction C was in dispute. In that case, defendant contended the trial court erred in refusing defendant's tendered not-in-MAI Instructions B, D, and E because such instructions comported with federal law pertaining to FELA, and federal law governs

in such cases. Instruction D contained the following language:

Defendant was not required to furnish plaintiff with the latest, best, or most perfect appliances with which to work, nor to discard standard appliances and tools already in use provided those tools and appliances in use were safe and suitable. You may not find defendant liable merely because there may be a safer or easier method of performing the work in question.

The Missouri Supreme Court affirmed the trial court's ruling with respect to all three instructions. Regarding Instruction D, the Court said, "Instruction D purports to converse the verdict director given in this case, Instruction 4, modeled upon MAI 24.01. Instruction D, however, is not in substantially the same language as that used in Instruction 4 and was, therefore, properly refused under MAI." *Id.* at 253. The Court further held that "[t]here is no compelling reason to limit application of the general rule that the form of instructions and manner in which the substantive law is submitted to the jury in an [sic] F.E.L.A. case are procedural matters governed by state law." *Id.* at 254.

Little, if any, difference exists between BN's Instruction C and Instruction D in the *Dunn* case. Instruction C purports to converse Plaintiff's verdict director, Instruction 7, given in this case, but it was not in substantially the same language as that used in the verdict director. Based on *Dunn,* BN's Instruction C was properly refused.

■ BN asserts in Point VI that the trial court erroneously failed "to strike the testimony of Plaintiff's economic expert witness, Larry Cox," after he testified, contrary to the requirements of a FELA action, that his economic projections for Plaintiff were based on his gross railroad wages rather than on Plaintiff's after-tax or net income.

This claim of error has not been preserved for our review because BN did not move to strike the testimony of Cox at trial. We have carefully searched the transcript covering Cox's testimony and find only one request by BN to strike any part of Cox's testimony. That request was directed to an

answer by Cox which BN claimed was unresponsive. That request was denied and BN made no other request to strike any portion of Cox's testimony on the grounds asserted here.

Where evidence is admitted subject to a motion to strike, and such motion is not made, the objection is waived. *Butler v. Crowe*, 540 S.W.2d 940, 945 (Mo.App.1976). A motion to strike must be timely made to preserve the error for review. In *Kunce v. Breen*, 671 S.W.2d 23 (Mo.App.1984), a motion to strike incompetent evidence was made after the expert witness was excused. This Court held that the motion "came too late." *Id.* at 26. Because BN made no motion to strike Cox's testimony, the objection is waived.

In Point VII, BN claims the trial court erred by "overruling in part paragraph 3 of [BN's] pretrial second motion in limine to allow Plaintiff to show what types of jobs and the number of jobs [BN] has available." According to BN, it was prejudiced when Plaintiff's counsel stated BN has 35,000 employees because that statement interjected a comparison between the size, power, and wealth of the parties.

This point presents nothing for appellate review because overruling a motion in limine cannot, by itself, be reversible error. *Wright v. Martin*, 674 S.W.2d 238, 242 (Mo.App.1984). Because the ruling on a motion in limine is interlocutory in nature, "[i]t is a timely objection at the trial to the proffered [sic] evidence which preserves the matter for review, and not the rejection of a motion in limine." *Ball v. American Greetings Corp.*, 752 S.W.2d 814, 824 (Mo.App.1988).

In Point VIII, BN makes the identical complaint raised in the preceding point concerning Plaintiff's reference to the size, power, and wealth of the parties. The only difference is BN's assertion in this point that the trial court erroneously overruled its objection to Plaintiff's opening statement remark that BN has 35,000 employees.

BN's only objection at trial to this statement was on the basis that it was argumentative. Obviously, the allegation of error in this point differs from BN's trial objection. " 'An appellant is not permitted to broaden the scope of his objection on appeal beyond that made in the trial court.' " *Missouri Pub. Serv. Co. v. Juergens*, 760 S.W.2d 105, 106 (Mo. banc 1988) (quoting from *State Highway Comm'n v. DeLisle*, 425 S.W.2d 938, 941 (Mo.1968)). Therefore, we decline to review this allegation of error.

BN contends in Point IX that the trial court erred by failing to strike the testimony of Plaintiff's witness, Mark Cole, for the same reasons asserted in Point IV.

Cole, a former BN employee, testified about his experience with the methods used by BN employees for stacking ties. He discussed the safety and availability of a tie-handler machine for that purpose. This evidence was admissible for the same reasons we discussed under Point IV.

Point X contends that the trial court erred by refusing BN the opportunity to read portions of the deposition testimony of Dave Gardner when other portions of his deposition were read to the jury in Plaintiff's case in chief. BN alleges that the excluded deposition testimony was relevant to Plaintiff's damages because it would have revealed that Plaintiff declined to participate in BN's wage continuation program.

Generally, when one party reads a portion of a deposition, the opposition may read some or all of the remainder in explanation. *Steenrod v. Klipsch Hauling Co.*, 789 S.W.2d 158, 170 (Mo.App.1990). Furthermore, when a party offers only a portion of a deposition, the other party may introduce other portions containing competent and relevant testimony. *Conner v. Neiswender*, 360 Mo. 1074, 232 S.W.2d 469, 473 (1950). The decision whether to admit deposed testimony is one that is largely within the discretion of the trial court. *Steenrod*, 789 S.W.2d at 170. On review, we accord the trial court broad discretion in ruling on the use of depositions. *Id.*

BN's argument here fails to explain how the excluded evidence was relevant to the issue of Plaintiff's damage. Plaintiff urges that the evidence had no relevance because the wage continuation program was "subject

to change at any time" and that, by participating in the program, Plaintiff became ineligible for other fringe benefits such as railroad retirement unemployment benefits and supplemental sickness or disability benefits. In view of the trial court's broad discretion on this issue, we cannot say the trial court erred in excluding the testimony especially when its relevance is unexplained.

We have carefully reviewed BN's remaining points and find them without merit. Lengthening this already long opinion by discussing each remaining point is unnecessary. Pursuant to Rule 84.16(b), we find that the evidence in support of the jury verdict is sufficient; that no error of law appears; and that a further opinion would have no precedential value.

### PLAINTIFF'S APPEAL NO. 18967

The only issue raised by Plaintiff's appeal is whether the trial court erroneously reduced his judgment in the total amount of $24,228.33. Plaintiff's point relied on states:

The trial court erred in granting Burlington Northern's Motion to Amend the Judgment and in reducing Keith's judgment to $875,771.67 because the $10,973 Keith received from the Railroad Retirement Board and the $13,255.33 Keith received from Benefit Trust Life pursuant to the collective bargaining agreement between BN and Keith's labor union should not have been used to reduce Keith's original $900,000 judgment, in that:

A. Burlington Northern failed to plead set-off or recoupment as an affirmative defense in its answer.

B. The reduction of Keith's judgment by the amount of payments he received from the Railroad Retirement Board was not authorized by R.S.Mo. § 490.710 (1986) since: (1) the RRB payments were not made as an accommodation to Keith and were not predicated on possible tort liability; (2) the RRB payments were not made by BN or its liability insurer; and (3) the fact that the RRB has a lien on a plaintiff's F.E.L.A. recovery has been held not to entitle a railroad to use RRB payments as a set-off against the plaintiff's judgment.

C. The reduction of Keith's judgment by the amount of payments he received from the BTL policy was not authorized by R.S.Mo. § 490.710 (1986) since: (1) BN failed to prove that these insurance benefits were made as an accommodation to Keith and were predicated on BN's possible tort liability; and (2) these payments were a fringe benefit of Keith's employment because they were made pursuant to the terms of a negotiated Collective Bargaining Agreement between BN and Keith's labor union, and such fringe benefit payments cannot be used to reduce Keith's F.E.L.A. judgment.

The pertinent facts are brief. BN's first pleading which sought a "credit" was a motion to amend the judgment. It was filed after the trial court entered judgment for Plaintiff in the amount of $900,000 in accordance with the jury's verdict. BN's motion requested a credit against the judgment for $10,973 paid to Plaintiff by the RRB for sickness benefits and a similar credit for $13,255.33 in insurance benefits paid to Plaintiff by Benefit Trust Life (BTL) in "accordance with the terms of the Collective Bargaining Agreement and the policy of insurance with [BTL] in force between [BN] and Plaintiff's labor union."

BN's motion alleged that the RRB was entitled to recover the sickness benefits paid to Plaintiff by virtue of a lien which had been asserted on any judgment in Plaintiff's favor. A copy of the lien notice to BN was attached to the motion. BN requested the credit so that it could directly pay the RRB's claim. The motion did not allege that BN was entitled to a credit for the RRB claim by virtue of § 490.710.

Finally, the motion alleged that § 490.710 authorized a credit to BN for the BTL insurance benefits paid to Plaintiff. No copies of the BTL policy or the Collective Bargaining Agreement were attached to the motion.

No evidence was introduced at the hearing on the motion. While arguing against the motion Plaintiff's counsel advised the trial court that the dollar amounts in the motion were correct and said, "I don't think there's

any question that Mr. Keith is going to have to pay those back, if and when we collect the judgment or get a settlement out of it. The only question is does Burlington–Northern get a setoff now, or does Mr. Keith simply have to pay those back when he gets the money." Plaintiff's counsel then unsuccessfully opposed BN's request on the same grounds asserted here.

Plaintiff's argument here acknowledges that the RRB has a valid lien on Plaintiff's judgment in the amount of $10,973. The only real dispute is how and who pays the RRB. The dispute centers on each party's valid concern over the exposure of possibly paying the same liability twice.

■ Therefore, it is unnecessary for us to decide whether the existence of the RRB lien constitutes an unpleaded affirmative defense because Plaintiff admits the validity and amount of it. The real issue is the method by which the lien should be paid so that neither party is exposed to a double payment.

45 U.S.C.A. § 362(o) provides as follows:

Benefits payable to an employee with respect to days of sickness shall be payable regardless of the liability of any person to pay damages for such infirmity. The Board shall be entitled to reimbursement from any sum or damages paid or payable to such employee or other person through suit, compromise, settlement, judgment, or otherwise on account of any liability (other than a liability under a health, sickness, accident, or similar insurance policy) based upon such infirmity, to the extent that it will have paid or will pay benefits for days of sickness resulting from such infirmity. Upon notice to the person against whom such right or claim exists or is asserted, the Board shall have a lien upon such right or claim, any judgment obtained thereunder, and any sum or damages paid under such right or claim, to the extent of the amount to which the Board is entitled by way of reimbursement.

■ An injured railroad employee and the employer railroad are jointly and severally liable for payment of the lien amount created by this statute. *United States v.*

*Atlantic Coast Line R.R.,* 237 F.2d 137, 139 (4th Cir.1956). In *Atlantic Coast Line,* the injured employee had earlier obtained a judgment against the railroad. Although the railroad had notice of the RRB's lien, the railroad paid plaintiff the entire judgment amount. Thereafter, the United States commenced an action to recover the amount of the lien. A judgment was entered against both the railroad and the injured employee. The court of appeals said the judgment was properly entered against both parties. *Id.* As a result of 45 U.S.C.A. § 362(o), the court determined that "[w]hen the railroad paid in full the judgment obtained by [plaintiff] without taking steps to protect the [RRB's] claim of which it had notice, it became liable, just as a garnishee would be liable who made payment to the debtor in disregard of garnishment proceedings." *Id.* at 140. The court then approved a method of payment which would protect the RRB's claim and the interests of both parties. Quoting from the district court below, the court said:

"If ... final judgment is rendered on the verdict against the Railroad, ... reasonable protection of the lien would seem to require notice thereof to the Clerk to whom the money is paid, at or before the time of payment, or in the alternative, notice to the Board, prior to payment of the judgment, in sufficient time for the Board to file a motion in the cause or otherwise intervene to protect its lien on the money in the hands of the Clerk."

*Id.*

This protective method is entirely consistent with Missouri case law. Our courts have held that "[j]udgment debtors may protect their rights to a proper satisfaction of record by placing the money in custodia legis and shift from themselves to the law and the court the responsibility of determining the rights of interested parties in and to the funds." *Bucknam v. Bucknam,* 347 Mo. 1039, 151 S.W.2d 1097, 1099 (1941).

. If BN pays the judgment amount (or at least the amount of the RRB's claim) into court, it can earlier notify the RRB of the funds' existence. Plaintiff can then take the necessary action to ensure the funds are released to the RRB. Taking these steps

protects both parties from paying the same liability twice, ensures that the RRB claim is paid, and provides BN a proper record of at least partial payment of Plaintiff's judgment.

■ The trial court improperly gave BN a credit for the amount of the RRB claim. For one thing, this method left Plaintiff unprotected if BN failed to pay. Another reason is that 45 U.S.C.A. § 362(*o*) makes no provisions for such a credit, and BN cites no cases indicating the credit is appropriate. Furthermore, in Missouri a judgment may be satisfied only by payment in full with accrued interest and costs except where a valid release is given or where there is a lawful agreement otherwise providing. *City of St. Louis v. Senter Comm'n Co.*, 343 Mo. 1075, 124 S.W.2d 1180, 1184 (1938). In other words, in this case BN has no right to a credit on Plaintiff's judgment without an agreement from Plaintiff otherwise providing. Therefore, that portion of the amended judgment giving BN a credit for $10,973 must be reversed. Our opinion provides BN with the necessary guidance for protection from the exposure of twice paying the RRB claim.

■ The problems relating to the credit given BN for the BTL benefits are entirely a different matter. From the record before us it appears that BN was given a credit on Plaintiff's judgment based only on the conclusory allegations of the unverified motion. No affidavits were attached to the motion, and no evidentiary hearing was held. Thus, the terms of the Collective Bargaining Agreement and the BTL insurance policy were not before the trial court. In short, there was no species of proof presented indicating why BN was entitled to a credit under § 490.710. A motion is not self-proving and the burden is on the movant to prove its allegations. *Pogue v. Associated Elec. Coop.*, 760 S.W.2d 169, 171 (Mo.App.1988).

In pertinent part, § 490.710 provides:

1. No advance payment or partial payment of damages, predicated on possible tort liability, as an accommodation to an injured person ... of medical expenses, loss of earnings and other actual out-of-pocket expenses, because of an injury ... claim against any person shall be admissible into evidence as an admission against interest or admission of liability by such party or self-insurer, or if paid by an insurer of such party, as the insurer's recognition of such liability with respect to such injured ... person....

2. Any payments made as provided in subsection 1 of this section shall constitute a credit and be deductible from any final settlement made or judgment rendered with respect to such injured ... person. In the event of a trial involving such a claim, the fact that such payments have been made shall not be brought to the attention of the jury.

Nothing in the record indicates that the BTL payments made to Plaintiff were "predicated on possible tort liability, as an accommodation to an injured person" or that the payments were made "because of an injury claim against any person."

Likewise, we cannot conclude from the record that BN was required to plead the affirmative defenses of setoff or recoupment concerning the BTL payments. Setoff is defined as "a remedy employed by a defendant to discharge or reduce the plaintiff's demand by an opposite one arising from a transaction which is *extrinsic* to the plaintiff's cause of action." *Edmonds v. Stratton*, 457 S.W.2d 228, 232 (Mo.App.1970). Recoupment is defined as "a purely defensive matter growing out of the transaction constituting plaintiff's cause of action and is available only to reduce or satisfy a plaintiff's claims and permits of no affirmative judgment." *Schroeder v. Prince Charles, Inc.*, 427 S.W.2d 414, 419 (Mo.1968). Without knowing the terms of the Collective Bargaining Agreement and the BTL insurance policy, this Court cannot state with any certainty that those terms gave BN the right to a setoff or the right to recoup the insurance payments. Therefore, the record is insufficient to allow us to address Plaintiff's claim that BN improperly failed to plead setoff or recoupment as an affirmative defense.

Under these circumstances, we believe this case is analogous to *C.C. MacLean III v. United S.W. Serv. Agency*, 792 S.W.2d 402 (Mo.App.1990). In *MacLean*, one of the defendants moved the court to require joinder

of two additional parties as necessary and indispensable parties to the action. The motion was unverified, no affidavits were attached to the motion, and no evidence was presented in support thereof. The trial court sustained the motion. After mentioning that a motion does not prove itself, this Court held that there was no evidence presented indicating why any additional parties were necessary or indispensable. *Id.* at 404. Quoting from *Taylor v. Coe,* 675 S.W.2d 148, 150 (Mo.App.1984), we acknowledged that "[i]t is the duty of this court to dispose finally of the case unless justice otherwise requires. Rule 84.14. That duty, however, presupposes a record and evidence upon which this court can perform that function with some degree of confidence in the reasonableness, fairness, and accuracy of its conclusion. When such record and evidence are not presented, 'reversal and remand necessarily follow.'" *Id.* The judgment was reversed and the cause remanded for a determination why the two additional parties were necessary and indispensable parties.

Like the movant in *MacLean,* BN failed to present facts supporting its motion indicating why § 490.710 applies to the BTL payments to Plaintiff. In addition, the record contains no facts indicating that BN was required to plead setoff or recoupment in order to be entitled to a "credit" for the BTL payments. Therefore, that part of the amended judgment which allows BN a $13,255.33 credit must be reversed.

In summary, (1) that part of the amended judgment allowing BN a credit of $10,973 for the RRB claim is reversed; (2) that part of the judgment allowing BN a credit of $13,255.33 for BTL insurance payments is reversed, and the cause is remanded for a determination on whether § 490.710 entitles BN to a credit for BTL insurance payments to Plaintiff, and for a determination on whether BN was required to plead its entitlement to a credit as an affirmative defense; (3) in all other respects the judgment is affirmed.

SHRUM, C.J., and PARRISH, J., concur.